23-08983MB(MAA)

# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jon Bergevin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— iPhone cellular telephone seized as line item 0003 in case 2023260400072201 on July 10, 2023, described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent (S.A.) with the United States (U.S.) Department of Homeland Security, Homeland Security Investigations (HSI), and have been since December of 2017.  Prior to December 2017, I was employed as a Special Agent in the Special Investigations Unit of the New Mexico Attorney General's Office for approximately two years primarily investigating official misconduct, fraud, and white-collar offenses. I have also worked as a Police Officer for the City of Aztec, New Mexico, and as a Probation/Parole Officer for the New Mexico Corrections Department.

3. I attended and completed the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia.  While in the academy, I was instructed

in constitutional law, controlled substances law, federal criminal law, customs law, immigration law and civil statutes. I attended and completed the New Mexico basic police officer training program, as well as various advanced law enforcement training courses.

4. Through my training, including on-the-job discussions with other law enforcement agents, I am familiar with the operational techniques and organizational structure of drug smugglers and drug trafficking distribution networks. My responsibilities include conducting investigations into drug smuggling organizations and individuals who derive substantial income form the illegal importation, manufacture, distribution, and sale of illegal controlled substances. As a S.A. with HSI, I am responsible for investigating and enforcing violations of federal law to include the enforcement of federal drug laws, and various Customs and Immigration violations.

5. Through training and experience I know:

   a. That drug traffickers use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating with smugglers, arrangers, and other transporters/drivers. They also use these devices to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans.

   b. That drug traffickers commonly maintain addresses or telephone numbers in books, papers, and cellular telephones which reflect names, usernames, addresses and/or telephone numbers of their associates in the smuggling organization;

c.  Drug trafficking and criminal organizations often use low cost, "burner" or "throw away" cellular phones for engaging in criminal activity to avoid detection by being able to quickly change telephone numbers to avoid detection. These phones often utilize SIM cards which allow the user to carry multiple SIM cards for use in a single phone. These phones also allow criminals to maintain separation between their "dirty" phones used for criminal activity and a "clean" phone used for non-criminal communication.

d.  Pre-paid cellular services are often used by drug trafficking and criminal organizations because of the relative anonymity with which they can be obtained as opposed to contractual services which require the user to provide identifying information.

e.  Drug traffickers and smugglers utilize cellular telephones to communicate about the logistics of smuggling drugs to include providing status updates on clearing various Ports of Entry and Border Patrol checkpoints, providing instructions and information on destinations, transfers, and points of contact.

f.  Drug traffickers/smugglers will sometimes delete messages, call logs, and communication applications from mobile cellular devices prior to crossing into the United States to prevent authorities from accessing communications related to criminal activity.

6. This affidavit is based on information which is personally known by your affiant or which your affiant has learned from other law enforcement agents. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is:

    An iPhone seized as line item 0003 in case 2023260400072201 "Device 1." Device 1 is currently secured at the HSI Nogales Office, located at 41 Paseo De Yucatan, Rio Rico, AZ.

8. The applied-for warrant would authorize the forensic examination of Device 1 for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

9. On July 10, 2023, at approximately 3:40 p.m., Ashley Stephanie MARTINEZ entered the United States via the pedestrian lane at the DeConcini Port of Entry (POE) in Nogales, Arizona. MARTINEZ had a large tote bag containing bags of chips. U.S. Customs and Border Protection Officers (CBPOs) subsequently discovered 3.28 kilograms of blue pills concealed within the chip bags. A representative sample of the blue pills later tested positive for the properties of fentanyl.

10. MARTINEZ was in possession of an iPhone cellular telephone in a seafoam green case, Device 1 when she crossed into the U.S. with the fentanyl.

11. While at the DeConcini POE on July 10, 2023, S.A. Bergevin observed the screen of Device 1 illuminate and display information multiple times while in plain view of S.A. Bergevin as he conducted the arrest, booking, and interview of MARTINEZ as documented in the following paragraphs (12, 13, and 14).

12. At approximately 4:38 P.M., S.A. Bergevin observed the cell phone's screen illuminate. S.A. Bergevin observed a missed video call from "Gordo" on WhatsApp.

13. At approximately 4:49 p.m., S.A. Bergevin observed the cell phone's screen illuminate. SA Bergevin observed an incoming call from Mexican telephone number +52 631-202-5403.

14. At approximately 5:45 p.m., S.A. Bergevin observed the cell phone's screen illuminate. SA Bergevin observed an incoming call from Mexican telephone number +52 631-186-3797.

15. During an interview MARTINEZ confirmed to S.A. Bergevin that Device 1 belonged to her and that no one else used Device 1.

16. MARTINEZ denied knowledge of the fentanyl pills concealed in the chip bags.

17. MARTINEZ stated she crossed into Mexico and a friend, Luis Manuel HERNANDEZ (hereafter "HERNANDEZ"), contacted her via WhatsApp to do him a favor by crossing chips into the U.S. She then got in line to return to the U.S. While in Line HERNANDEZ gave her a bag containing the bags of chips in which the fentanyl pills were concealed.

18. MARTINEZ stated she was going to give the chips to HERNANDEZ's brother or his friend. MARTINEZ had never met HERNANDEZ's brother. She knew the friend only as "Guero." MARTINEZ stated they were likely going to call her to arrange for the receipt of the bag/chips. She believed the chips were going to Tucson. However, she did not know why they would take the chips to Tucson.

19. MARTINEZ believed HERNANDEZ had been caught at a checkpoint, with what she believed to be cocaine, and as a result could not cross into the U.S. She also believed there was a warrant for his arrest. MARTINEZ stated she had known HERNANDEZ since February 2023.

20. MARTINEZ stated HERNANDEZ's contact was saved in her cell phone as "Gordo."

21. When asked if her phone contained any references to drugs, MARTINEZ advised that it contained messages about cocaine with HERNANDEZ.

22. In summary, HERNANDEZ communicated with MARTINEZ via WhatsApp to arrange for the fentanyl pills concealed in chip bags to be smuggled into the U.S., which he then physically delivered to MARTINEZ. At approximately 4:38 P.M., and some time after MARTINEZ was apprehended, S.A. Bergevin observed a missed video call from "Gordo" on WhatsApp, the contact name for HERNANDEZ. MARTINEZ also admitted that she and HERNANDEZ's communication's referenced cocaine at some point on Device 1.

23. Additionally, S.A. Bergevin then observed incoming calls from two (2) Mexican telephone numbers that did not display a name or contact information. The

observed calls all occurred some time after MARTIENZ was initially encountered by CBPO's at primary and after a period of time in which she likely would have been through CBPO screening had she not been apprehended with the fentanyl pills.

24. Based on your affiant's training and experience it is common for smugglers to receive numerous calls from both known and unknown numbers after a time in which if they were not apprehended, they would have successfully arrived in the U.S., with smuggled controlled substances. Drug traffickers often monitor the smuggler's movements and know when they arrive at primary inspection. Smugglers often receive direction or anticipate receiving direction once they have successfully cleared inspection at a POE.

25. Therefore, your affiant submits there is probable cause to believe Device 1 contains evidence of drug trafficking activity and conspiracy of the same as it may reveal, among other things, telephone calls, text, and/or voice messages, content sent/receive via third-party applications such as (ex. WhatsApp, Snapchat, Instagram, etc…) directions, cell phone location history, relating to drug trafficking and the identity or location of the individuals who were involved in the procurement, transportation, and intended delivery of the controlled substances.

26. In addition to the evidence sought, it is possible that evidence obtained from a search of Device 1 would allow law enforcement to identify the individuals, contacts, and locations referenced during MARTINEZ's post-*Miranda* interview which would aid law enforcement in corroborating or refuting her statements.

27. Device 1 is currently in the lawful possession of HSI. Device 1 is currently in storage and secured in the HSI Nogales Office, located at 41 Paseo De Yucatan, Rio Rico, AZ.

## TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may

also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it

has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product specifications available online, I know that Device 1 has capabilities that allow them to serve as a wireless telephone, receive and send messages, access the internet, utilize Wi-Fi, utilize GPS, and a digital camera. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Examining data stored on this type, can also uncover, among other things, evidence that reveals or suggests who the user of the device was in communication with in conspiring to import and possess with the intent to distribute methamphetamine and heroin, in violation of Title 21, United States Code, Sections 952, 841 and 846.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

31.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how Device 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on Device 1:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Device 1 consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of Device 1 to human inspection in order to determine whether it is evidence described by the warrant.

  33. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

  34. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device 1 described in Attachment A to seek the items described in Attachment B. Your Affiant believes that Device 1 contains evidence relating to the commission of a criminal offense, that is, possession with intent to distribute

controlled substances and conspiracy to do so, in violation of Title 21, United States Code, Sections 952, 841, 846 and 963.

                                        Respectfully submitted,

                                        JON P BERGEVIN  *Digitally signed by JON P BERGEVIN*
                                                                 Date: 2023.07.28 09:55:56 -07'00'

                                        Jon Bergevin, Special Agent
                                        Homeland Security Investigations

Subscribed and Sworn to
telephonically this 28th day of July, 2023:

_____
Honorable Michael A. Ambri
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

The place/item to be searched is:

iPhone cellular telephone, seized as line item 0003 in case 2023260400072201 on July 10, 2023, hereinafter referred to as "Device 1." Device 1 is currently secured at the HSI Nogales Office, located at 41 Paseo De Yucatan, Rio Rico, AZ. The device was placed in airplane mode on July 10, 2023.



(Photographs of Device 1 taken on July 10, 2023.)

## ATTACHMENT B

1. All records on Device described in Attachment A that relate to violation of Title 21, United States Code, Sections 952, 841, 846 and 963, including:

   a. lists of contacts and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information) or the destination or individuals to whom the drugs were to be delivered (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording contact between MARTINEZ and any other co-conspirators whom have not yet been identified;

   e. Evidence of user attribution showing who used or owned Device 1 and at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   f. Records evidencing the use of Device 1 to access the Internet or other web based messaging or communications applications (ex. WhatsApp, GroupMe, Gmail, etc…).

    g. Images, movies, and other media containing evidence of drug trafficking including voice messages, images of drugs or the instrumentalities of drug trafficking such as vehicles, license plates, locations, documents/receipts for the purchase of trafficking instrumentalities, payment methods, and any other media associated with drug trafficking.

    h. Location records/information

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.